DOCKET#
U.S. DISTRICT COURT
WEST DIST. OF WISCONSIN

IN THE UNITED STATES DISTRICT COURT

JUL 3 1 2009

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

MICHAEL J. KOZLOWSKI,

                Defendant.

OPINION AND ORDER

08-cr-160-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Defendant Michael J. Kozlowski was found guilty by a jury of five counts of knowingly and willfully using a false document, namely his driver's log, in a manner within the jurisdiction of the Federal Motor Carrier Safety Administration, in violation of 18 U.S.C. § 1001(a)(2). Alleging that the court admitted undisclosed and inadmissible expert testimony and instructed the jury erroneously on the element of "use," he has moved for judgment of acquittal and for a new trial, as well as for dismissal on the ground of improper venue. I concluded that defendant is correct; it was error to instruct the jury as I did on the meaning of the word "use" in the indictment. Therefore, I will grant his motion for a new trial. I will deny his motions for judgment of acquittal and for dismissal for improper venue.

1

BACKGROUND

At all times relevant to the indictment, defendant Michael J. Kozlowski was an over-the-road trucker, employed by Whole Foods Market at its terminal in Munster, Indiana.  It was a requirement of his job and of the United States Department of Transportation, Federal Motor Carrier Safety Administration, that he keep a log of his time on each trip he took, showing the times he spent driving, in his sleeper berth resting, and on duty but not driving.

Sometime in the early morning of October 16, 2005, as defendant was driving from Minnesota back to Munster, he overturned his semitrailer truck on the interstate, blocking both lanes.  Shortly thereafter, a bus carrying Chippewa High School band members hit the truck, killing five of the bus passengers.  A subsequent criminal trial against defendant in state court in Eau Claire County, Wisconsin, ended in a judgment of acquittal on 33 criminal counts stemming from the accident.

In the course of investigating the accident, law enforcement discovered log books in the tractor of the rig that defendant had been driving.  The books contained falsified and incomplete entries for trips defendant had taken.  The government sought an indictment from the grand jury, which was returned on October 23, 2008, charging defendant with 12 violations of 18 U.S.C. § 1001(a)(2), for knowingly and willfully using a false document, namely his driver's log.  Later, the government sought a superseding indictment, charging

2

defendant with 20 violations of § 1001; still later it sought a second superseding indictment, charging just five violations, focusing on alleged misrepresentations about times that defendant was in his sleeper berth.

The case went to trial on May 11, 2009. Defendant asked the court to define the term "use" as follows: "A defendant uses a document when he or she employs it in some way. Mere possession of a document without some active employment is not sufficient to constitute use of the document." I denied that request in favor of the following instruction: "A defendant 'uses' a document when he employs it for a given purpose." After two days of trial, the jury found defendant guilty of all five counts of knowingly and willfully using his falsified log book.

## OPINION

18 U.S.C. § 1001(a)(2) makes it a crime to *make* or *use* "any false writing or document knowing the same to contain any materially false, fictitious or fraudulent statement or entry." In this case, the government chose to charge defendant with "using" and not "making," presumably to avoid having to prove for venue purposes that defendant had made any of the false entries in his driver log while he was in the Western District of Wisconsin. Once the government made this choice, it had to prove that defendant "used" his driver's log in this district.

3

To meet its burden, the government put in extensive evidence that defendant needed his driver's log with him at all times while on the road so that if he were stopped, he could produce it for inspection; that the Federal Motor Safety Carrier Administration contracts with the Wisconsin State Patrol, underwriting 80% of the cost of inspecting commercial motor carriers for compliance with federal safety regulations, including sleeper berth time; and that the inspections are important to the administration in helping prevent accidents caused by driver fatigue.  The government showed that defendant had the log book in his tractor in Wisconsin when the tractor trailer flipped over on October 16, 2005.  It put in no evidence that defendant ever produced his log book for inspection on any of the five dates charged in the indictment:  September 11 and 25, 2005 and October 2, 9 and 11, 2005. The government obtained the log book during its investigation of the accident and its search of the tractor, not directly from defendant.

The government put in proof that defendant had the log book in the Western District of Wisconsin, that he knew the information in the log book was false, that the false entries were material and that the matter was one within the jurisdiction of the executive branch of the government.  The only disputed element relates to use.  Is having a log book containing false entries in the tractor in the event that it would be needed for inspection purposes in Wisconsin a "use" within the meaning of § 1001, or does the statute require actual production of the falsified log in response to a government inquiry?  A second question is

4

whether making false entries in a log book constitutes "use" within the meaning of the statute.

Defendant argues that the court's instruction was erroneous. Telling the jury it could find that use meant "employing a document for a given purpose" suggested to the jury that it was sufficient to find that defendant had the document at hand in the event he might have to produce it. This allowed the jury to find that defendant used the logs by merely possessing them in the event he was stopped. According to defendant, the proper course was to tell the jury it had to find that he *actively* employed the logs. Had this course been followed, he says, the jury would have known that it had to find that he produced them to another person, such as a law enforcement officer or to his employer and that he did not merely keep them at hand. The government counters by asserting that the court's instruction allowed defendant's counsel to argue to the jury that the government had not proved anything more than mere possession by defendant.

Although I thought at the time that allowing defendant's counsel to make these arguments was sufficient and that the word "use" could cover keeping a log book in the tractor, thereby having it available to produce upon request to a law enforcement officer, I now believe that this view is erroneous. I have been unable to find any case law on the subject of "use" in § 1001. This may be because the usual way in which persons make false statements to the government is by lying when responding to questions or by submitting

5

false documents.  The circumstances of this case are unusual, because defendant never handed over the false documents in this district.  But it is unlikely that the drafters were thinking of criminalizing the mere possession of a false document.  The evil to be prevented is the *making* of the false documents or the *use* of the document to obtain something of value, even if that something is only the right to continue to travel.

The Supreme Court has not addressed the meaning of the word "use" in § 1001, but it has discussed it as it appears in other criminal statutes.  In <u>Bailey v. United States</u>, 516 U.S. 137 (1995), the Supreme Court examined the word's meaning in 18 U.S.C. § 924(c)(1), which imposes an additional penalty upon anyone convicted of a crime of violence or drug trafficking crime who "uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."  Lower courts had reached conflicting results; some had found mere proximity of a gun sufficient, while at least one court had used a multifactor test including the accessibility of the gun, its proximity, whether it was loaded and what kind it was.  The Supreme Court ruled that use must connote more than mere possession of a firearm by one who commits a crime, noting that if Congress had wanted to make possession alone sufficient for liability, it could have made specific provision for that result.  <u>Id.</u> at 143.  Addressing the next question, which was what the government would have to show to establish use in addition to mere possession, the Court held that it would have to show active employment.  <u>Id.</u> at 144.

6

The Court started by looking to the language of the statute, giving "use" its ordinary or natural reading, as implying action and implementation. Second, it considered the word's placement and purpose in the statutory scheme, starting with the assumption that Congress intended each term to have meaning. By specifying two types of conduct, "uses" and "carries," it implied a differentiation between the two. The Court noted that if "use" is read broadly, to cover such things as putting a gun in place to protect drugs, no meaning would be left for "carries." It was satisfied that if Congress had meant to broaden the application of the statute beyond actual "use," it would have said so specifically, as it did in 18 U.S.C. § 924(d)(1), which provides for the forfeiture of any firearm "used" or "*intended to be* used" in certain crimes. Finally, the Court looked at the amendment history of § 924(c), which had originally used the phrase, "uses a firearm to commit," indicating that Congress had intended to reach the situation in which the firearm was employed actively during commission of the crime and not conduct such as storing a gun in a nearby closet for retrieval. The Court found no evidence in the legislative history to suggest that Congress had intended to eliminate any difference between "uses" and "carries."

Of particular importance to defendant's case is the Court's rejection of "use" as having "an ongoing, inactive function fulfilled by a firearm," as in the statement, "I use a gun to protect my house." Id. at 149. The Court was explicit: placing a firearm to provide a sense of security or to embolden its owner, even placing it in a place where it was readily

7

accessible to the owner, did not constitute use.  Id.

In Jones v. United States, 529 U.S. 848 (2000), the Court construed the term "use" in § 844(i), which makes it a crime to damage or destroy by means of fire or an explosive and "property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."  Jones tossed a Molotov cocktail through the window of the home his cousin owned and occupied in Indiana.  He was charged with arson under § 844(i) and found guilty.  He appealed to the Supreme Court, arguing that the statute did not apply to buildings not used for commercial purposes and that the statute exceeded Congress's authority under the commerce clause.  The Court found that the word "used" in the statute referred to the use of the building, not to whether the destruction of the building would affect interstate commerce.  It rejected the government's effort to show use of the building in interstate commerce by its use as collateral by the owner to obtain a mortgage from a lender in Oklahoma or to obtain insurance from a company in Wisconsin or to receive natural gas from outside Indiana.  It held that the requirement that the building be "used" in interstate commerce was "most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce.  Although 'variously defined,' the word 'use,' in legislation and conversation, ordinarily signifies 'active employment.'"  Id. at 855 (quoting Bailey, 516 U.S at 143 & 145).

The Supreme Court took the same position in Leocal v. Ashcroft, 543 U.S. 1 (2004),

8

interpreting the word "use" for the purpose of determining whether the defendant's conviction of driving under the influence and causing injuries was "(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or "(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."   18 U.S.C. § 16.   The defendant's deportation depended on whether the offense came within the meaning of § 16.

The Court looked at "use" in relation to the words "against the person or property of another," concluding that it is not natural to say that a person actively employs physical force against another person by accident.  Id. at 9.  "[W]e would not ordinarily say a person 'use[s] physical force against' another by stumbling and falling into him."  Id.  The ordinary or natural reading of the words of the statute suggested to the Court that "use" of physical force in § 16(a) applied to a "higher degree of intent than negligent or merely accidental conduct" and required a finding that the defendant's drunk driving conviction was not a crime of violence.  Id.  Turning to § 16(b), the Court found that it contained the "same formulation," id. at 11, that was determinative in § 16(a), meriting the same construction. In both sections, "use" of physical force required a higher *mens rea* than the merely accidental or negligent conduct involved in a driving under the influence offense.  Id.

In light of these decisions, I believe that it was error to omit the word "active" from

9

the instruction on "use" that I gave the jury.  The jury should have been told that it could not find use unless it could find active employment.

It seemed reasonable at the start of trial that having a false document in one's possession to show to a law enforcement officer was a "use" of that document, in the sense that it serves a protective use as a shield from arrest.  I no longer think that this view stands up to close examination in light of <u>Bailey</u>.  The driver may never have to produce the log; until he does, he has not actively employed it.  The driver's need to "make" entries in the book does not constitute "use" under the statute, which distinguishes between "makes" and "uses."  § 1001(a)(2).  As the Court noted in <u>Bailey</u>, 516 U.S. at 146, when Congress uses two different terms, courts should assume it intended the terms to have different meanings.  To read "use" as including "makes" would eliminate the intended difference.

Although I am persuaded that the instruction on "use" was incorrect, I disagree with defendant that his other challenges would require a new trial.  These objections include the court's decision to (1) admit undisclosed and inadmissible expert testimony; (2) allow the government to refer to the October 16, 2005 accident; (3) refuse to admit plaintiff's exhibit demonstrating payroll records from Whole Foods; and (4) allow the government to introduce plaintiff's deposition testimony in which he admitted falsifying entries in his log book.

1. Expert testimony

Defendant takes exception to the admission of testimony by five different witnesses, arguing that their testimony strayed from their own observations about their work duties to expert testimony, despite their never having been identified as expert witnesses.  He begins with two inspectors from the Wisconsin State Patrol.  The first, William Berger, testified about the recovery of evidence from the accident scene, what he recovered and why he collected it; his review of the log books that he recovered; his interview of defendant on the afternoon of October 16, 2005; defendant's statement to him that he had a third log book in his tractor that contained his entries about October 11, 2005; Berger's inability to find the third log book when he returned to the tractor; and defendant's admission that he used IPASS and that his Garmin GPS had been on at the time of the accident.  Berger explained what log books are used for; how he reviews them when he conducts inspections of commercial motor vehicle drivers; and his purpose for the review, which is to determine whether drivers are operating without sufficient rest.

When Berger testified about how commercial motor vehicle drivers use their log books, defendant objected to it as eliciting undisclosed expert testimony.  The objection was overruled on the ground that Berger was giving general information about log books, how drivers use their log books, how Berger uses the books to carry out his job responsibilities of enforcing Department of Transportation and Federal Motor Carrier Safety Act regulations.

11

He testified as well that a driver must account for the 24 hours of each day and indicate when he is on-duty, on-duty but not driving, in his sleeper birth and behind the wheel. He added that as an inspector with the state patrol, he reviews log books under a contract between the Federal Motor Carrier Safety Administration and the state patrol and was doing so in 2006. None of this testimony is expert testimony. Rather, it is fact testimony about Berger's job duties. It is rationally based on Berger's personal observations and not on scientific, technical or other specialized knowledge. Fed. R. Evid. 701. It is no different in nature from the testimony of a physician about the treatment he gave an ill person and why he chose one course of treatment over another.

Inspector Tom Walters testified to his interview with defendant in the early morning hours of October 16, 2005. He testified that defendant told him the GPS was on at the time of the accident and was capable of keeping records, that he sent the GPS to Garmin for data analysis and that when he received the data dating back to October 14, 2005, he matched it to certain fixed latitude and longitude points, specifically toll plazas in Illinois. He compared the data from the Illinois Tollway for IPASS transponder 1806958 from October 14, 2005 for the same toll plazas and learned that the IPASS data matched the Garmin data.

Defendant objected to a question to Walters about the interest of the Wisconsin State Patrol in the accuracy of log books. After the objection was overruled, Walters explained that the Federal Motor Carrier Safety Administration pays 80% of the salary of

12

state patrol inspectors to pay for the inspection of commercial motor vehicle drivers, trucks and log books. The state patrol's job is to make sure that drivers get enough rest, that they do not drive more hours than allowed by the government and that their log books are accurate. Again, none of this testimony is expert in nature. It is merely information that any state patrol inspector would acquire on the job.

Mark Oesterle testified for the government as an employee of the Federal Motor Carrier Safety Administration. Defendant objects to his testimony about the content, interpretation, purpose and application of the agency's regulations. Oesterle explained the partnership between the agency and the Wisconsin State Patrol for enforcement of the regulations, which is supported by a federal grant. He explained what a compliance review is and how it is conducted at the employer's place of business. He cited the regulation governing rest for drivers and explained why the agency views rest periods as important for driver safety. He was shown a copy of defendant's October 2, 2005 entries in his log book and explained what the entries meant, which ones were required by regulation and which were not. He testified that the entries on October 2 complied with the regulations. He testified as well that false entries by drivers have the potential to influence the agency. None of this testimony is expert in nature.

Defendant called Robert Corkwell, a special inspector for the Federal Motor Carrier Safety Administration, as his witness. He objects to questions put to Corkwell in cross-

examination. For example, he objects to the government's question whether truck drivers use their log books to comply with federal laws when they have them in their possession and when they're "driving up and down the highway," Trans., dkt. #107, at 43, arguing that this was improper bolstering of the government's position on the meaning of "use." He also objects to two hypothetical questions put to Corkwell. The first was whether the action of the Federal Motor Carrier Safety Administration would be influenced if "a commercial motor vehicle driver uses a log book to repeatedly lie about time spent in a sleeper berth." Id. at 47. The second was whether it would have influenced the action of the Federal Motor Carrier Safety Administration if Corkwell had known that defendant had admitted falsifying his log books when he conducted his review of Whole Foods' logbooks in late October 2005. These questions were not improper; they merely elicited information that Corkwell had acquired from working for the agency.

Defendant contends that the court applied a double standard to his attempt to ask Special Agent Chris Smith from the United States Department of Transportation what he thought about the way in which defendant had filled out his log books. These questions were not allowed because Smith had no personal knowledge of how defendant had filled out the log books. It was not error to sustain the government's objections to them. Defendant had not shown that Smith worked with the regulations he was asked about or had reason to know their content.

14

2. References to accident

Defendant objects to the court's allowing the government to put in any evidence about the accident. Before trial, I ruled that neither party could say anything about the bus accident that followed defendant's rollover. Both sides were limited to statements that an accident had occurred, that it consisted of defendant's flipping his truck and that he was interviewed after the accident. Defendant now says that even that much evidence was too much, because it allowed the jury to connect the accident to the lack of proper entries in the log book. He argues that even if the jury did not know about the accident involving the bus, he was prejudiced by the possibility that the jury would be more inclined to convict him if it knew he had had an accident.

As I ruled at trial, it was necessary to explain a limited amount about defendant's accident in order to put into context the questioning of defendant and the investigation of the crash scene that led to finding the driver logs. The evidence was carefully limited in advance and the government never exceeded the bounds placed on it. Defendant has shown no reason to characterize the few references to the accident as unfairly prejudicial.

3. Exclusion of defendant's payroll records

Defendant contends that it was error to prohibit him from introducing payroll records

15

from Whole Foods showing that it had paid defendant for trips even when he had not submitted his records of duty status for those trips.  He says that the evidence would have shown that the records were not important to Whole Foods.

The evidence defendant wanted was not only redundant (because the defense had shown that Whole Foods paid drivers according to estimated hours and not according to their log books), but irrelevant.  The question was not whether the log books were important to Whole Foods but whether they were important to the Federal Motor Carrier Safety Administration.  It was not error to deny defendant's attempt to introduce Whole Foods' payroll records.

4. Admission of deposition excerpts

It was not error to allow the government to play the tape of excerpts of defendant's deposition, taken for use in a civil personal injury case brought against him in state court. His admissions regarding his false entries were relevant; the questions put to him by counsel did not constitute inadmissible hearsay because they were not being used for their truth; and he was able to play the portions he wanted to make the presentation complete.

B. Motion for Acquittal

Defendant argues a number of grounds for granting his motion for judgment of

16

acquittal.  First, of course, he argues that the government never proved he "used" his log books within this district.  I have discussed this argument at length in explaining why I think the instruction was erroneous.  However, I do not believe that defendant has shown that he could not be found guilty by any reasonable jury that is instructed properly.  I agree that it seems unlikely that the government would be able to prove him guilty under the correct instructions, I cannot say as a matter of law that it could not.

In addition to arguing that the government never proved he "used" any false documents, defendant argues that he should be acquitted because the government never proved that he even had possession of the log books.  As the government points out, the log books contained defendant's certification that he had made entries in the books on certain days.  The jury could have found from these certifications that he had the books with him on those days, even though he admitted that he did not always make contemporaneous entries as he was suppose to.  In addition, when the log books were found in his tractor on October 16, 2005, they contained entries dating back to July 10, 2005.  Each page he had certified corresponded to a count in the indictment.

Defendant argues another alleged defect in proof: the government never proved that the books were false when he possessed them.  Again, the jury was entitled to draw reasonable inferences.  It could have inferred from the regulations requiring him to have his log book current as to the last change in duty status that he kept the book with him and it

17

could have found from the numerous false entries that defendant had had false documents with him on the dates charged in the indictment.

Defendant's motion for judgment of acquittal will be denied.


### C. Motion to Dismiss for Improper Venue

This motion is essentially another version of defendant's argument that possession does not equal "use" under § 1001(a)(2). He argues that the government never proved that he used his driver's log in the Western District of Wisconsin, so as to make venue proper in this district; the government maintains that it did prove "use." It is not a matter that cannot be determined before any retrial.


### ORDER

IT IS ORDERED that defendant Michael Kozlowski's motion for a new trial is GRANTED; his motions for judgment of acquittal and dismissal for improper venue are

18

DENIED.

Entered this _____3/st_____ day of July, 2009.

BY THE COURT:

*Barbara B. Crabb*

BARBARA B. CRABB
District Judge

19